UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 7:19-CR-7-REW-EBA |
| v. | ) | |
| | ) | OPINION & ORDER |
| SCOTTY R. AKERS, M.D., et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Defendant Dr. Scotty Akers ("Dr. Akers") filed 11 motions *in limine* pending retrial in this case. DE ##132–142. Per the Court's briefing schedule, the Government filed an omnibus response, *see* DE #152, and Dr. Akers submitted an omnibus reply, *see* DE #156. The motions are ripe for review.

**1. Background and Posture**

The original Indictment charged Dr. Akers and Co-Defendant Serissa Akers, née Stamper, ("Serissa") jointly with one count of conspiring to distribute controlled substances outside the scope of professional practice, not for a legitimate medical purpose, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and six counts of aiding and abetting one another in the unlawful distribution of controlled substances under 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. DE #1. Defendants faced trial on the Indictment over six days in October 2019. The Court declared a mistrial on October 29, 2019, after the jury was unable to reach a unanimous verdict as to any count against either

Defendant. DE #76. The United States advised its intent to retry the case, and the Court scheduled the retrial for January 2, 2020, setting pretrial and liminal filing deadlines accordingly. DE #88.[1]

The grand jury returned a Superseding Indictment in early December 2019, retaining the conspiracy charge, replacing the prescriptions (and in some instances, the patients) identified in the various distribution counts and adding several new distribution charges, and adding a charge against only Dr. Akers for making a false statement in violation of 18 U.S.C. § 1001. DE #95. The United States subsequently filed two supplemental motions *in limine*. DE ##104, 105. After Dr. Akers obtained new counsel, the Court continued the retrial to April 6, 2020, extending the pretrial and liminal deadlines. DE #123. The Court later permitted another brief extension of the motion and filing deadlines. DE #130. The Court also denied DE #105 and granted, in part, DE #104. *See* DE #131. Thereafter, Dr. Akers submitted the instant motions *in limine* (DE ##132–142), and the Government moved *in limine* to exclude references to the first trial (DE #144). Defendants did not oppose DE #144, and the Court ultimately granted it. DE #151.

On March 13, 2020, Chief Judge Reeves continued generally all trials set to occur or begin before April 17, 2020, for a minimum of 30 days, due to the COVID-19 pandemic and resulting gathering restrictions. DE #146 (General Order No. 20-2). The Court held a March status conference to discuss trial rescheduling. *See* DE #157 (Minutes). As discussed during the hearing and reflected in DE #157, firm rescheduling is currently impracticable given fluidity of the global

---

[1] The Court noted, with party agreement, that it deemed any previous liminal rulings (*i.e.*, proof admissibility decisions issued *before* commencement of the first trial) applicable to the retrial. DE #88 at 1; *see* DE #50 (resolving three motions *in limine*—DE ##34, 42, and 43—filed before the first trial). As the Court clarified, evidentiary motions made and resolved during the first trial, though, are part of only the prior record and thus inapplicable to the retrial. *See* DE #88 at 1 n.1. The *principles* of such rulings, though, would guide the Court again.

2

health crisis and shifting responsive measures.[2] A status conference is set for April 27, 2020 to reassess the schedule. *See id.*

Only Dr. Akers's motions *in limine* remain pending. The Court considers each pending motion in turn, grouping treatment of issues where logical.[3]

## 2. Motions to Exclude Legal Conclusions (DE ##132, 133, and 134)

Dr. Akers seeks to prevent three prospective witnesses from testifying regarding what he perceives to be legal conclusions: DEA Task Force Officer (TFO) Randy Cline, a lay witness, and designated expert witnesses Dr. Timothy King and DEA Diversion Investigator (DI) Morgan Freeman.

Several principles govern the general category of legal opinions. First, the Court and only the Court will give the jury instruction on the governing law. A lay or expert witness may not cross that boundary. *See Torres v. Cty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985). Second, an expert's testimony may embrace an ultimate factual issue, but not an ultimate legal issue. *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994). In no event may an expert opine on whether a

---

[2] The Court made detailed STA findings, dovetailing with those in General Order Nos. 20-2 and 20-3, and found the current schedule and general continuance fully STA compliant under the circumstances. DE #157.

[3] Motions *in limine* "narrow the issues remaining for trial and to minimize disruptions at trial." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999). "As a general rule, a court should exclude evidence on a motion *in limine* only when that evidence is determined to be clearly inadmissible on all potential grounds." *Tucker v. Nelson*, 390 F. Supp. 3d 858, 861 (S.D. Ohio 2019) (internal quotation marks and citation omitted). "Such motions serve important gatekeeping functions by allowing the trial judge to eliminate from consideration evidence that should not be presented to the jury because it would not be admissible for any purpose." *Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F. Supp. 2d 853, 858 (W.D. Mich. 2008) (citation omitted). However, where the evidence is not *clearly* inadmissible, "evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice can be resolved in the proper context." *Tucker*, 390 F. Supp. 3d at 861 (citation omitted). Courts generally should avoid excluding "broad categories of evidence[.]" *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975). In such a case, the "better practice is to deal with questions of admissibility of evidence as they arise." *Id.*

3

defendant did or did not have a mental state constituting a crime element. Fed. R. Evid. 704(b). No witness may testify as to the overarching conclusion of guilt or innocence, or the establishment of a count element. *United States v. Volkman*, 797 F.3d 377, 388 (6th Cir.); *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019). Still, an expert may supply all ingredients needed to allow the jury to come to the legal conclusion presented, essentially, all the steps but the terminal legal inference. *Berry*, 25 F.3d at 1353.

Third, in particularly complicated legal scenarios, the Court may permit an expert more leeway to explain the regulatory or legal background. *See, e.g.*, *United States v. Seelig*, 622 F.2d 207, 213 (6th Cir. 1980); *United States v. Anh Thi Nguyen*, 497 F. App'x 722, 724 (9th Cir. 2012). This mostly is to give context for testimony and to assure that the expert's contribution fits and is helpful to the trier. Fourth, a witness's language in testimony that overlaps key legal terms warrants scrutiny. Where the legal term has a distinct meaning, the Court must carefully guard its role as sole law giver. *See Volkman,* 797 F.3d at 388 (citing *Torres*, 758 F.2d at 151). However, where terms have common or regular significance in the vernacular, in typical usage, the dangers lessen. *Id.* Finally, some of these lines are blurry, and the Court has significant discretion in drawing them. *See Torres*, 758 F.2d at 150–51. The Court can and should admonish the jury in gray areas about witness roles, testimony versus instruction, and the Court as the lone voice on what the law does or does not require.

*Dr. King (DE #132) and DI Freeman (DE #133)*

Dr. King testified as the Government's sole medical expert during the first trial, and the United States intends to call him again as an expert witness in the retrial. Dr. King previously testified, as a general matter, about the standard of care for opioid prescribing, as informed in part by his understanding of relevant state regulations. DE #116 at 193–307; DE #118 at 19–79. For

4

example, he testified that state administrative regulations governing controlled substance prescribing were a valuable source of information in his practice, requiring such things as routine in-person examinations, detailed recordkeeping, and complete patient histories (including queries from such sources as KASPER) before prescribing—things that, per King, are largely "common sense" to most physicians working in pain management. *See, e.g.*, DE #116 at 212–20. In particular, King referenced regulations in place in Kentucky (201 KAR 9:260). *Id.* Dr. King further discussed, throughout his testimony, the federal regulatory standard from his medical view and applied it to several hypothetical prescribing scenarios that the Government presented. Dr. Akers moves to prevent King from testifying similarly at the retrial, regarding applicable administrative regulations, his views of the regulatory requirements, and application of those requirements to the instant case.

Under Rule 702, a qualified expert witness may offer opinion testimony if his specialized knowledge will assist the jury in understanding the evidence or deciding facts, the testimony has an adequate factual basis, the testimony is the product of reliable methods or principles, and the expert has reliably applied those principles or methods to the case facts. Fed. R. Evid. 702. Further, as a general matter, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). Dr. Akers contends that Dr. King's testimony about applicable regulations (and in particular, the Kentucky regulations) is inadmissible under Rules 702 and 704 because, per Defendant, it offers a legal conclusion about an ultimate issue in the case (Defendants' guilt).[4] Dr. Akers relies heavily on *Berry* in so arguing. There, the Court concluded that an expert witness's opinion that certain police practices amounted to "deliberate indifference" served to define a legal

---

[4] Dr. Akers does not cite a specific subsection of Rule 702. In context, it seems that he views the regulation testimony as an unhelpful aid to the jury under Rule 702(a), as he argues that it impermissibly communicates a legal conclusion.

term and, as "[i]t is the responsibility of the court, not testifying witnesses, to define legal terms[,]" "[t]he expert's testimony in this regard invaded the province of the court." *Berry*, 25 F.3d at 1353.

Though *Berry* did not cite or rely on *Torres*, the thrust of the rules applied in these cases (and later in *United States v. Sheffey*, 57 F.3d 1419 (6th Cir. 1995)) is the same. Indeed, the *Volkman* Court later fused the analyses, relying on both *Torres* and *Berry*:

> A witness' testimony contains a legal conclusion only if "the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular." *Torres*, 758 F.2d at 151. An expert may not opine on the overarching question of guilt or innocence, but he or she may "stat[e] opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue." *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994).

*Volkman*, 797 F.3d at 388. The *Volkman* Court determined that the expert witness permissibly phrased his opinion in terms of prescriptions' "legitimate medical purpose" and physicians' "usual course of professional practice," as those terms have overlapping medical vernacular and legal usages; the legal meaning is not distinct from the medical one—"instead, one elucidates the other." *Id.* at 390; *see id.* at 389 ("Certainly, there is the legal question of whether a prescription had a 'legitimate medical purpose,' but the question is hardly answered in isolation. Rather, the 'lay' or, as we have previously described it, 'vernacular' understanding of the phrase—*i.e.*, the phrase as used in medical parlance—naturally informs the legal question.").

The *Volkman* outcome is instructive. Dr. King's contemplated testimony about the appropriate standard of medical care permissibly embraces an ultimate issue from a factual perspective, consistent with Rules 702 and 704, without transgressing legal conclusion bounds. He may use the words "legitimate medical purpose" and "usual course of professional practice"; as in *Volkman*, the phrases—frequently used in the medical world—are necessary to permit sensible and coherent expert opinion on the relevant medical standards. *See id.* (quoting *United States v.*

6

*Chube II*, 538 F.3d 693, 698 (7th Cir. 2008)) (observing that "it is impossible sensibly to discuss the question whether a physician was acting outside the usual course of professional practice and without a legitimate medical purpose without mentioning the usual standard of care[]"); *see also United States v. Bennett*, 874 F.3d 236, 245 (5th Cir. 2017) (observing that reference to "[t]he medical regulations [ ] helped clarify the scope and contour of 'outside the course of professional practice'—the very purpose for which the trial was being conducted"); *United States v. Crabtree*, 878 F.3d 1274, 1287–88 (11th Cir. 2018) (finding a witness's discussion of "Medicare rules and regulations" admissible, with a proper limiting instruction, where the witness's testimony "illumined how far afield HCSN's practices were from normal"); *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011) (concluding that the district court did not abuse its discretion by admitting expert testimony about federal and state securities regulations, where such was needed "to explain the intricate regulatory landscape and how securities practitioners function within it"); *id.* (noting "that when the legal regime is complex and the judge determines that the witness' testimony would be helpful in explaining it to the jury, the testimony may be admitted"). And, critically, the phrasing conveys no distinct legal meaning, as discussed.

As to the state regulation, Dr. King plainly links, often as a matter of common sense, the propriety of medical practice to awareness of and compliance with regulatory limits. Thus, Dr. King may reference the Kentucky and federal regulations and the way they, from his perspective as a physician, confirm or shape proper medical practice. *Cf. United States v. Azmat*, 805 F.3d 1018, 1042–43 (11th Cir. 2015) (validating an expert medical witness's reliance on "federal and state standards[,]" including "the medical guidelines and standards of care for both Georgia and the United States" as part of the foundation for his opinion on proper practice). Again, the Court will be prepared to admonish or instruct, at the time, to keep Dr. King within the proper lane. That

said, Dr. Akers's admitted non-compliance with Kentucky regulations led to his practice restriction and that proof will be admitted. Dr. King's references to the same standards are clearly relevant to defining the usual course of medical practice. His perception of the regulatory requirements as both indicative of legitimate practice and obligatory on a compliant physician is a proper testimonial basis for a medical expert. Again, as *Volkman* stresses, the medical view elucidates the legal view. The Court **DENIES** DE #132 on these terms.

Consistent with the prior discussion, as to DEA Diversion Investigator Freeman, the Court draws lines. Assuming her qualifications on the issue of diversion, the Court will allow Freeman to reference the particular standards for prescription validity in the context of explaining her role, training, and investigative steps. Further, she may, based on experience, discuss "red flags" in diversion specific to physician practices and relevant to this investigation. *See Seelig*, 622 F.2d at 213–14 (concluding that a DEA compliance officer, with four years' experience and regulatory familiarity, admissibly testified about "the requirements of federal regulations and what the routine practices of pharmacists should be according to the regulations"). The Court will permit Freeman to note areas of concern in the evidentiary materials for this case. The Court will not permit Freeman to state any conclusions on whether Akers did or did not violate Title 21 or the implementing regulations. As to hypotheticals, the Court will have to hear them and decide. The Court is unlikely to allow questions that call on Freeman to opine about the lawfulness of conduct by Akers or by a hypothetical practitioner parallel to Dr. Akers to the extent any such answers call for Freeman to convey legal conclusions to the jury. As such, at this time, the Court **DENIES** DE #133.

However, as a general matter, the Court notes its serious concern over any witness purporting to describe in detail legal principles to a jury—that is exclusively a function of the

8

Court. No witness may provide the law to the jury. Rather, it likely would be helpful to the jury and the parties for the Court to give a short, mid-trial substantive instruction on the Title 21 framework and the exception for registrants under the Act.[5] That description would set the legal markers, properly from the Court, and eliminate the need for navigation of much of this line witness to witness. The Court will circulate a proposal pretrial.

*TFO Cline (DE #134)*

TFO Cline appeared as a fact witness at the first trial, generally testifying about his investigation of Dr. and Serissa Akers. In the process, he outlined the federal regulatory framework governing the prescribing of controlled substances (namely, 21 C.F.R. §§ 1306.04 and 1306.05) and how it structured his investigation in this case (discussing, among other things, specific prescriptions that Dr. Akers issued and corresponding communications between Serissa and the receiving patients). DE #115 (Tr.) at 190–264. When neither Defendant objected, the Court permitted the Government to display the regulations' text to the jury, as a testimonial aid only.[6] *Id.* at 195–97. Relying primarily on Rule 701, Dr. Akers seeks to preclude TFO Cline from referencing the regulations at the retrial and offering any legal conclusions concerning Dr. Akers's compliance.[7]

---

[5] The Court may allow some display of the regulations as an aid to testimony; the Court will not allow admission of any regulations or statutes into evidence. The law is not evidentiary.

[6] The Court explicitly clarified for the jury that the regulations were not evidence.

[7] Though the motion mentions Rule 602, the reply's discussion omits it; as the Government notes, Dr. Akers does not substantively argue that TFO Cline lacked personal knowledge of the regulatory requirements or investigation details. *See* Fed. R. Evid. 602 (permitting testimony only if "the witness has personal knowledge of the matter[]"). As he testified in the first trial, TFO Cline both has considerable experience working with and applying the relevant regulations during his work with the DEA, and he personally participated in the investigation of Dr. and Serissa Akers. The Court perceives no basis for a Rule 602 challenge.

Under Rule 701, a lay witness's opinion testimony is admissible only if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. As noted, in assessing admissibility of opinion testimony that arguably embraces an ultimate issue, the Court considers "whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular." *Sheffey*, 57 F.3d at 1426 (quoting *Torres*, 758 F.2d at 151 (6th Cir. 1985) (citations omitted)). "If they do, exclusion is appropriate." *Id.* The *Torres* and *Sheffey* Courts acknowledged both the danger of testimony containing a legal conclusion and the discretion appropriately afforded in evaluating whether it does:

> The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury. This "invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law." Although trial judges are accorded a relatively wide degree of discretion in admitting or excluding testimony which arguably contains a legal conclusion, that discretion is not unlimited. This discretion is appropriate because it is often difficult to determine whether a legal conclusion is implicated in the testimony.

*Sheffey*, 57 F.3d at 1425 (quoting *Torres*, 758 F.2d at 150 (citations omitted)).

The Court has carefully reviewed TFO Cline's testimony at the first trial and, at the outset, observes that TFO Cline did not offer any opinion as to whether Dr. Akers's prescriptions were issued for legitimate medical purposes or within the usual course of professional practice. Indeed, TFO Cline testified only as to facts related to Dr. Akers's prescriptions and the circumstances surrounding their issuance; as such, Defendants affirmatively declined any dual fact-opinion role instruction during Cline's testimony and the Court, agreeing that Cline's testimony did not veer into opinion territory, did not give one. DE #115 at 253–54. Furthermore, it is clear that Cline— who is not a medical professional—*could not* permissibly opine as to the medical legitimacy of

10

any particular prescription. Though—contrary to Dr. Akers's position that the regulations' verbiage "has clear legal meaning and significance," *see* DE #156 at 3—"the legal understanding of the phrase 'legitimate medical purpose' does not carry with it a 'separate, distinct and specialized meaning' from its medical counterpart[,]" *Volkman*, 797 F.3d at 389 (quoting *Torres*, 758 F.2d at 151), Cline is inadequately qualified to offer a medical opinion, in any event. Nor does the Government suggest that it intends to elicit such an opinion from TFO Cline during the retrial.

Rather, it seems that Cline's intended role mirrors that in the first trial and would largely be limited to an overview of the regulatory framework governing the investigation into Dr. Akers and details of the investigation itself (*e.g.*, the components of Dr. Akers's prescriptions that had investigative significance, the surrounding communications between Serrissa and receiving patients, Cline's inquiry into Dr. Akers's recordkeeping practices, etc.). TFO Cline's discussion of the regulations' substance, in this context, is not for the purpose of opining on the ultimate issue of prescription legitimacy (or, indeed, opining as to anything at all) or offering legal conclusions concerning Dr. Akers's guilt of the alleged criminal violations. Instead, the regulations, which shaped the investigation course and illuminate the perceived investigative value of the uncovered evidence, perhaps would provide important background information and context for Cline's permissible factual testimony. *See Anh Thi Nguyen*, 497 F. App'x at 724 (concluding that an expert did not impermissibly "testify to legal conclusions, but instead provided permissible background on the regulatory framework"); *United States v. Fumo*, 655 F.3d 288, 303 (3d Cir. 2011), *as amended* (Sept. 15, 2011) (noting that, while experts cannot state the governing law of the case, their testimony may "include applicable legal regulations, such as[,]" in that case, the "registration

requirements for securities registration under the Securities Acts").[8] The regulatory background is needed, at least generally, for the jury to understand the value Cline attributed to certain pieces of evidence throughout the investigation.

While Cline may generally reference the regulatory environment and its influence on the investigation, the Court will not permit him to testify on particular CFR requirements relevant to this case. As noted, the Court will circulate a proposed substantive midtrial instruction outlining the pertinent regulatory framework; such an instruction preserves the Court's proper role as the sole legal authority, while reasonably permitting Cline (and others) to tether their testimony to the regulatory structure. As it relates to the regulations in context, without reference to § 1306.05, for example, it would be difficult for the jury to fully appreciate the significance, in Cline's investigation, of evidence like post-dated prescriptions and pre-signed prescription blanks. And, these facts, gleaned from specific prescriptions that TFO Cline reviewed in conjunction with associated text and Facebook messages about them, are relevant and helpful to the jury's ultimate determination as to whether Dr. Akers issued these prescriptions in the usual course of professional practice. *Cf. Volkman*, 797 F.3d at 392 (describing the jury's role, in "determin[ing] whether a physician has violated the CSA," to "undertake a case by case analysis of evidence to determine whether a reasonable inference of guilt may be drawn from specific facts") (internal quotation marks and citation omitted).

In any event, Cline is a fact witness, not an opinion witness (lay or otherwise). He can testify regarding facts generated from the investigation, but he is not to give opinions in the case.

---

[8] Though Dr. Akers discounts the persuasive value of cases involving expert, rather than lay, testimony as applied to Cline, the role distinction does not impact this particular analysis. The experts in *Fumo* and *Nguyen* were as unqualified to opine on the overall governing law or offer legal conclusions on ultimate issues as any witness, as doing so would invade the provinces of the Court and jury.

The Court thus **GRANTS** DE 134 **in part**. Cline may not offer opinion testimony. He may generally refer to the regulatory framework, but as to the specifics of any regulatory or statutory requirement, that will need to come from the Court or another permitted witness. Cline may otherwise testify to matters relevant to facts of consequence in the case.

### 3.    Motions to Exclude Treating Providers' Testimony (DE ##135 and 136)

Dr. Akers moves to exclude expert testimony from treating physician Dr. Jason Rice and Advanced Practice Registered Nurse (APRN) Heather Eperson[9] concerning Dr. Akers's previous treatment of Ronnie and Lovan Pennington. DE #135. Neither medical provider testified during the prior trial. In its response, the Government represents that it does not intend to ask Dr. Rice or APRN Eperson about the prescriptions identified in the Superseding Indictment; nor does it intend to elicit their general expert opinions of Dr. Akers's care or practice. Rather, the Government expects to ask Rice and Eperson about their own treatment of the Penningtons and, to the extent they would touch on Dr. Akers's prior treatment, it would only be "in the context of explaining their own decision-making as practitioners[,]" *e.g.*, explaining why they chose to lower the patient's dosage from that prescribed by Dr. Akers. DE #152 at 17.[10] Dr. Akers concedes that such

---

[9] As demonstrated in the DEA 6 forms the Government provided to Defendants, an APRN appears authorized to prescribe controlled substances. The form uses the label "Dr." The Court may need more information on APRN qualifications, depending on the testimony intended. The question of APRN practice and physician interplay may be confusing to the jury, and the Court would not want to inject a collateral matter unnecessarily. Thus, an APRN's view as to proper medical practice may or may not shed light on the corresponding physician standard. The Government should be prepared to address that. The Court is somewhat dubious about allowing two APRNs to testify on the same subject matter.

[10] Though Defendant challenges sufficiency of the Government's expert notice under Rule 16, the DEA Form 6 accompanying the notice in fact discloses the only arguably expert territory that the United States advises it may enter—the providers' views of the Penningtons' prior dosages and reasoning for lowering it during the course of their own treatment. DE #135-2 at 3, 6.

testimony, about the provider's own patient treatment decisions, would be permissible. The Court thus **DENIES** DE #135 as, functionally, moot.[11]

Defendant also seeks to exclude all testimony from APRN Betty Miller, whether as a treating provider or general expert, under Rules 702, 401, and 403. DE #136. Dr. Akers argues that, given her short treatment of Jeff Rose (following Akers's treatment of him), APRN Miller has insufficient testimonial bases under Rule 702. Dr. Akers further argues that any general testimony about Miller's treatment or prescribing practices is irrelevant and cumulative. As with Dr. Rice and APRN Eperson, the Government responds that it would question APRN Miller only as to matters related to her personal treatment of Rose (including, potentially, explanation of any deviation from prior prescription dosages or drug combinations issued by Dr. Akers). Accordingly, to the extent DE #136 seeks to exclude expert opinion testimony from Miller about Dr. Akers's general medical practice and prescribing conduct (which would indeed be improper, given the lack of factual basis for such testimony, per the notice and DEA Form 6), the request is again moot as a practical matter, as the Government will not pursue such improper questioning.

Miller may, though, testify as to her personal medical practice and treatment (however brief) of Rose. The DEA 6 confirms that APRN Miller personally treated Rose during only one visit—the visit where she informed Rose that the clinic would be tapering his medication, due to a failed drug screen. DE #136-2 at 1. It also notes that Miller worked closely with Rose's regular treating physician, Dr. Lalonde (who has since retired and relocated out of Kentucky). *Id.* The

---

[11] The Court agrees, though, that the tendered expert disclosures for Rice and Eperson provide an insufficient factual basis under Rule 702 for any opinion as to the general legitimacy of Akers's practice or prescribing habits. Because the Government indicates that it will not present such testimony, the Court need not specifically rule on the issue. However, should the circumstances differ at trial, the Court will fairly apply Rule 702 and exclude any expert testimony that is insufficiently supported.

disclosure thus identifies a sufficient factual basis for limited treating provider testimony from APRN Miller. Consistent with the United States's disclosure, she may testify, under Rule 702, about her preparation for the taper visit (including review of Dr. Lalonde's prior treatment notes, or her understanding of Rose's medical situation based on discussions with Dr. Lalonde) and what occurred during the visit itself (*i.e.*, her actual treatment of Rose and the bases for her medical decisions). Miller may not, though, veer into any testimony (opinion or otherwise) not grounded in such direct knowledge.

Nor do Rules 401 or 403 bar testimony regarding Miller's[12] general medical and prescribing practices, as the record currently stands. Such testimony clears the low Rule 401 relevance bar. *See* Fed. R. Evid. 401 (deeming relevant any evidence tending to make a fact of consequence more or less probable than it otherwise would be); *see, e.g.*, *United States v. Whittington*, 455 F.3d 736, 739 (6th Cir. 2006) (agreeing with the district court's observations that "the relevance threshold is very low under Rule 401[,]" and "the government is permitted to build an incremental case[]"). Evidence of various providers' prescribing practices and standards may assist the jury in understanding the "usual course of professional practice" from an objective perspective and measuring Dr. Akers's conduct against it—a central task the jury faces in this case. Miller's testimony on this issue need only add another drop to the evidentiary bucket.

Further, the testimony does not appear, on this record, to be needlessly cumulative. *See* Fed. R. Evid. 403 (directing exclusion of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative

---

[12] Again, as mentioned in note 12, the Court will address the potential need for additional information concerning general APRN qualifications and, specifically, the collaborative treating and prescribing relationship between an APRN and physician.

15

evidence[]"). As Defendant recognizes, only Dr. King testified from a medical standpoint at the first trial about the applicable standard of care and typical prescribing practices. Given the objective, collective nature of the "usual course" standard, measured against providers' general practices, testimony from two medical experts on the topic is certainly far from cumulative.[13] And, at this stage, it is not clear whether Dr. Rice or APRN Eperson are guaranteed to testify at all, or, more importantly, to testify about general prescribing practices and standards in particular. Accordingly, the Court cannot say, at this stage, that Miller's contemplated testimony would be so cumulative as to outweigh its evidentiary value. The Court thus **DENIES** DE #136 but will, at trial, monitor the proof progression to guard against unneeded repetition.

### 4. Miscellaneous Exclusion Motions (DE ##137–142)

*Government Exhibit 34 (DE #137)*

Government Exhibit 34, admitted without objection at the first trial, is a Cellebrite report comprising an exhaustive collection (over 1000 pages) of Serissa's text messages during the alleged conspiracy timeframe. The United States ultimately referenced only two distinct portions of the message set, admitted separately as Exhibits 18a and 25, during patient testimony. Defendant objects to admission of the full message report, noting that much of it is unrelated to the case and, in Dr. Akers's view, potentially prejudicial. Dr. Akers and the United States have stipulated to admissibility of Exhibits 18a and 25 and, thus, agree that admission of the full Exhibit 34 report is unnecessary at the retrial.[14] As the Government agrees not to seek admission of the full challenged

---

[13] The Court also notes that, during the first trial, a recurring defense theme rested on the difference, and difficulty, in caring for this particular Eastern Kentucky patient population. As Dr. King practices in Indiana, testimony about prevailing medical standards from a medical provider based in Eastern Kentucky could provide a slightly different—and quite relevant—perspective.

[14] Serissa did not participate in the liminal motion briefing; however, she did not object to the admission of Exhibits 18a and 25 at the first trial. Further, as mentioned several times, Dr. Akers

exhibit, the Court **DENIES** the DE #137 exclusion request as moot, per the parties' agreement on the topic.

*Patient Refunds and Las Vegas Trip (DE ##138 and 139)*

Citing Rules 401 and 403, Dr. Akers seeks to exclude reference, as was made at the first trial, to Defendants' failure to provide patients refunds for prescriptions that went unfilled after Dr. Akers lost his medical license. DE #138. Defendant argues that this evidence is irrelevant, as evidenced by the Government's failure to meaningfully connect it to its case theory during closing arguments at the first trial, and that any potential relevance is substantially outweighed by danger of unfair prejudice. In response, the United States cites four reasons it perceives the information relevant: (1) the fact that a refund was contemplated when a prescription went unfilled tends to show that the money the patients paid was for the prescription—and, really, the drug—itself, rather than Dr. Akers's time and skill attendant to considering and writing the prescription; (2) that Dr. Akers claimed not to know that Serissa issued no refunds undercuts Serissa's testimony that she merely followed Dr. Akers's orders with respect to monetary decisions, indicating greater complicity in planning and execution of the distribution scheme; (3) that Defendants' claimed inability to afford refunds demonstrates financial incentive and motivation underlying their quick prescribing and collection efforts immediately preceding Dr. Akers's license suspension; and (4) the failure to remit refunds as promised weakens Defendants' good faith theory. DE #152 at 21–22.

---

and Serissa, through counsel, are again pursuing a joint defense theory. The Court anticipates no objection from Serissa regarding the content of (former) Exhibits 18a and 25 at the retrial.

The first and second theories fairly and plainly demonstrate the refunds' relevance under Rule 401.[15] A primary theme in the Government's case was (and is) that the patients—who paid in cash each time, and could not use insurance—were not paying for medical care, but for the prescription itself. That patients would seek or expect full refunds for services (medical care) purportedly already delivered, because they were unable to receive the medications, suggests that access to the drugs was the central component of the fee. Such an inference both makes it more likely that Dr. Akers's practice was not within the usual professional course and reflects on Defendants' understanding of what the doctor-patient relationship comprised—*i.e.*, whether the patients viewed Dr. Akers "as a healer" or "as a seller of wares." *United States v. Alerre*, 430 F.3d 681, 691 (4th Cir. 2005). Similarly, Serrissa's involvement in and, per Dr. Akers, control over the refund discussions and process indicates a level of financial decision-making (which Serissa disclaimed, per her testimony). It thus bears on her intent and knowledge of the doctor-patient relationships, as an alleged co-conspirator.

Used in this way, the probative value of this evidence is not substantially outweighed by risk of unfair prejudice. *See, e.g.*, *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993) ("Unfair

---

[15] The Court is less persuaded by the third and fourth justifications, though both cross the bar here. Defendants' financial situation after Dr. Akers's license suspension—and after the charged conspiracy period—may potentially bear, to a degree, on prescribing intent beforehand, but the connection is attenuated, and the probative force of the resulting inference is lower. Similarly, Defendants' financial decisions not to refund patients (for whatever reason) has little impact on the jury's assessment of his good faith in *practicing medicine*. As the Government points out, good faith here refers to "an objective 'good faith' attempt to comply with the law, as measured against the actions of a reasonable doctor under the circumstances, allowing for reasonable mistake or misunderstanding[,] that is, a doctor who 'act[s] in accordance with what he reasonably believed to be proper medical practice.'" *United States v. Godofsky*, 943 F.3d 1011, 1026 (6th Cir. Nov. 26, 2019). Yet, the payment and refund issues do fairly reflect on the way Dr. Akers dealt with patients during the closure period. The unorthodox transactions, including the advance prescribing and absence of any refund, signal oddity relative to a typical prescriber-patient interaction and support well enough the intents and purposes attributed by the Government.

prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis."). Dr. Akers does not explain the improper decisional basis he believes the evidence risks, and the Court perceives none. The Court thus **DENIES** DE #138. The Court will, of course, balance the proof's ultimate use and role at trial under Rule 403 and ensure that it does not veer into unfairly prejudicial (*e.g.*, character) territory.

Next, Dr. Akers seeks to exclude evidence of a trip he took to Las Vegas with Serissa during the charged conspiracy period, and while Serissa was prescribed opioids by him. DE #139. As evidenced by a Facebook post, the pair had dinner "and cocktails" one evening, and the Government used this to demonstrate that Dr. Akers knew of Serissa's drinking while taking opioids—"red flag" conduct, per the Government's witnesses—and yet continued to prescribe her the medication. The proof that Akers knew Serissa was engaging in unsafe opioid and alcohol mixing, and yet both permitted the conduct to occur and continued to prescribe to her thereafter, is relevant under Rule 401. It is concrete evidence that Akers was aware of and ignored a patient red flag and, under Rule 403, is not outweighed by danger of prejudice beyond that resulting from its legitimate probative force; it thus presents no substantial risk of *unfair* prejudice outweighing considerable evidentiary value. The Court rejects the expansive socio-cultural arguments movant attributes, overbroadly, to the region.

Surrounding details, though, fare less well in the Rule 403 calculus. As the Court indicated at the first trial, reference to the dinner venue—an upscale, relatively expensive steakhouse—is not relevant and may unfairly prejudice Dr. Akers. The precise restaurant has no relevance, and the Rule 403 balancing thus favors exclusion of reference to its name. The Court views the dinner location—Las Vegas—as possibly prejudicial. Las Vegas is often associated with opulence and

19

excess and, to some, morally doubtful conduct, such as gambling. People in the general population—and potentially on the jury—may hold moral or religious views on the propriety of these activities. However, this locale is an important cross-reference to the KBML order. As such, the Court allows the mere reference to the destination city. The Court thus **GRANTS**, **in part**, and to this extent, DE #139. The Government may mention Dr. Akers's knowledge of Serissa's red flag conduct, but it may not reference the specific restaurant where the events occurred or other trip particulars, except destination.[16]

*Melissa Mayhorn's Suicide Attempt (DE #140)*

At the first trial, the Government questioned Mayhorn, Dr. Akers's former patient, about her painful withdrawal experiences after becoming addicted to opioids prescribed by Dr. Akers during the treatment period. The testimony culminated in Mayhorn revealing a suicide attempt, which occurred after she abruptly stopped receiving opioids from or having contact with Dr. Akers. Dr. Akers seeks to exclude reference to the suicide attempt, arguing that its potentially prejudicial impact outweighs any relevance it may have in this case. The United States responds that the suicide attempt reflects both the severity of Mayhorn's withdrawal (unmanaged by Dr. Akers after he ceased prescribing to her) and her deteriorating mental health, which the Government argues Dr. Akers had a duty to monitor.

The Court finds the relevance theories, as tied to the suicide effort specifically, speculative; moreover, whatever relevance the attempt may have is outweighed by its realistic danger of causing unfair prejudice. A suicide attempt may be the product of many different things, and perhaps multiple things simultaneously; there is no evidence that Mayhorn suffered from mental health difficulties during the period she received prescriptions from Dr. Akers, nor is there

---

[16] This will require some exhibit redaction.

evidence beyond Mayhorn's own testimony that the attempt resulted (in part, or primarily) from the withdrawal she was experiencing. It is indeed relevant that Mayhorn suffered withdrawal symptoms after discontinuing treatment with Dr. Akers; that fact tends to indicate, among other things, that Dr. Akers was inattentive to tapering needs toward the end of his course of treating Mayhorn. It is also relevant that Dr. Akers did not inquire into the mental health of his patients during the prescribing period, as this indicates a departure from normal, accepted opioid prescribing practices. However, the fact of the suicide attempt itself is not necessary to probe either of these topics. The Government is free to question Mayhorn generally about her withdrawal symptoms and Dr. Akers's lack of counseling about opioid cessation; it is also free to ask Mayhorn (indeed, any patients) about whether Dr. Akers inquired into their mental health states during the time they received opioid prescriptions.

Reference to the suicide, though, is not particularly probative on either point—given the uncertainty that it was connected to any issue involved in this case—and, regardless, it serves to primarily rouse deep feelings of sympathy with the jury. Many Americans, the potential venire included, have personal experience with and a visceral emotional reaction to the topic of suicide. Indeed, at the first trial, Mayhorn (understandably) broke down in tears on the stand. Accordingly, the risk of this detail emotionally influencing the jury far outweighs any evidentiary significance it may have. As noted, the Government is free to explore the relevant topics in a range of ways that do not so engage the jury's emotions or sympathies. The Rule 403 balance thus warrants exclusion, under these circumstances, and the Court **GRANTS** DE #140.

*Subsequent Treatment and Ted Carter Testimony (DE ##141 and 142)*

21

Dr. Akers moves to exclude, under Rule 407, evidence of the patients' medical treatment subsequent to their relationships with Dr. Akers. DE #141. Rule 407 prohibits evidence of "measures [ ] taken that would have made an earlier injury or harm less likely to occur" to prove "negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction." Fed. R. Evid. 407. The Rule functions to bar evidence of remedial efforts because admitting such would discourage needed safety measures. As a general matter, the Rule excludes inherently unreliable evidence. *See In re Air Crash Disaster*, 86 F.3d 498, 530 (6th Cir. 1996). Reliance on Rule 407 is inapt here. There is, at bottom, no "earlier injury or harm" that physicians' subsequent treatment of patients *would have made less likely to occur*. The earlier and later actors are distinct. To say that the later doctors' treatment choices would have made Dr. Akers less likely to prescribe chronic opioids (if that could indeed be a conceivable harm in Rule 407 terms) is nonsensical and illogical. The later treatment is not simply a "fix" or remedy for prior medical choices Dr. Akers made; it, in of itself, constitutes evidentiary examples of treatment choices and options available to providers working with this specific patient population, near the time Dr. Akers treated them. Rule 407 does not logically pertain.

Though the timing does not directly overlap, there is relatively close temporal proximity between Dr. Akers's treatment and the subsequent providers' treatment, occurring just outside of the charged conspiracy window. Evidence of the subsequent providers' treatment is relevant, as the Government argues, to whether Dr. Akers's treatment of these patients was based on legitimate medical needs—that, per Akers, were chronic and static, and would not have dissipated in a matter of months or less—and whether Dr. Akers's chosen treatment plans were roughly consistent with, or stark deviations from, the treatment plans implemented by the subsequent providers. Nor does Dr. Akers meaningfully develop a Rule 403 theory or explain any potential for unfair prejudice,

and the Court perceives none. Accordingly, finding the evidence relevant and otherwise admissible (as Rule 407 does not apply, and there is no legitimate Rule 403 exclusion basis), the Court **DENIES** DE #141. The later treatment must be temporally proximate, as a reasonable matter of persuasiveness, to the period of Dr. Akers's treatment. Further, patients can testify only to what they personally know and without hearsay importation.

Lastly, Dr. Akers seeks to exclude any reference to former patient Ted Carter's financial difficulties—and struggles to finance his prescription purchases from Dr. Akers—as well as the fact that Carter did not hear from Dr. Akers or Serissa after the license suspension. The former proof is relevant to the Government's theory that Dr. Akers's patients exhibited typical diversion red flags, including borrowing money or making serious financial sacrifices to continue purchasing prescription drugs. Moreover, Serissa's (and, through Serissa, Dr. Akers's) awareness of the lengths to which patients went to finance their prescription opioid habits during the relevant period directly bears on Defendants' knowledge and intent, which are centrally relevant to the drug conspiracy and distribution charges. The probative value of information surrounding Ted Carter's efforts, perhaps desperate at times, to maintain his opioid supply relates directly to the expert "red flag" proof and outweighs any perceived (yet not demonstrated) prejudice risk that Dr. Akers asserts.

However, reference to the Akerses' failure to contact Carter after the May 2018 license suspension is not relevant or helpful to the jury in determining any fact issue in the case. At that point, Dr. Akers could no longer legally provide medical treatment or advice, in any form; he was entirely unable to engage in professional medical practice from May 2018 forward. Any contact with Carter after his license suspension would thus not have been a part of, or relevant to, Dr. Akers's treatment course or conduct as Carter's medical provider. The substance of their post-May

23

relationship, wholly personal at that stage, has no bearing on Dr. Akers's course of overall professional medical practice. In that context, any failure to reach out to or check on Carter would merely tend to improperly suggest a character flaw—that Defendants acted as poor friends—rather than any legitimate case-related proof. On balance, given its lack of relevance and potential for unfair prejudice, Rule 403 requires exclusion. Accordingly, the Court **DENIES in part**, and **GRANTS in part**, DE #142.

**5. Conclusion**

For the reasons discussed, and on the specific terms outlined, the Court **ORDERS** as follows:

1. The Court **DENIES** DE ##132, 133, 136, 138, and 141:

2. The Court **DENIES AS MOOT** DE ##135 and 137;

3. The Court **GRANTS** DE #140; and

4. The Court **GRANTS in part** and **DENIES in part** DE ##134, 139 and 142.

This the 21st day of April, 2020.

**Signed By:**

_**Robert E. Wier**_

**United States District Judge**